

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-18-00060-CR
_____

BILLY KEITH BASYE, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 336th District Court
Fannin County, Texas
Trial Court No. CR 16-25832

Before Morriss, C.J., Burgess and Moseley,* JJ.
Memorandum Opinion by Justice Moseley

_____

*Bailey C. Moseley, Justice, Retired, Sitting by Assignment

MEMORANDUM OPINION

After a jury found Billy Keith Basye guilty of manslaughter with a deadly weapon finding, he was sentenced to ten years' incarceration.[1] Basye appeals his conviction for manslaughter, maintaining that the trial court erred (1) when it denied his motion for mistrial following what he contends was an argument by the State that was calculated to comment on his constitutional right to remain silent and (2) when it overruled his objection to the State's closing argument, which he contends included facts outside of the record. For the reasons below, we affirm the trial court's judgment.

II.     **Background**

About 9:00 p.m March 6, 2016, Basye drove his Chevrolet Avalanche truck head-on into a Dodge Stratus passenger car driven by Rachel Roberts.[2] Roberts' son, T.R., her mother, Patti Medcalf, and Dominque Larson were passengers with Roberts in the automobile. As a result of the crash, both Roberts and T.R. were killed. Although both Medcalf and Larson were seriously injured, they survived the collision.[3] Basye's twin sons, Z.X. and J.X.,[4] were in the back seat of

---

[1]Basye was also convicted of a second count of manslaughter and appeals that conviction in our cause number 06-18-00061-CR. In addition, he was convicted of one count of aggravated assault with a deadly weapon and appeals that conviction in our cause number 06-18-00062-CR. Basye was charged with one count of aggravated assault causing serious bodily injury and appeals that conviction in our cause number 06-18-00063-CR. Because Basye raised identical issues in all four appeals, he filed a single, consolidated brief. Consequently, this opinion addresses all of Basye's issues as they relate to each of his convictions.

[2]Basyes' truck had a curb weight of 5,652 pounds, whereas Roberts' passenger car's curb weight was 3,297 pounds.

[3]As a result of the accident, Medcalf suffered seven broken ribs, a fractured neck, a crushed hand, and a fractured wrist.

[4]To protect the privacy of the children, we refer to them by initials.

2

his truck and were uninjured. Basye himself suffered a facial injury and was transported to a nearby hospital.

The Texas Department of Public Safety (DPS) conducted an investigation of the collision.[5] The report issued by it gave the conclusion that the car driven by Roberts had been traveling west on Highway 56, while Basye was traveling eastbound. Basye crossed over the center line and struck the left side of Medcalf's vehicle. The impact caused Roberts' car to spin counter-clockwise off the north side of the road, where it struck a utility pole. Both Medcalf and T.R. were ejected from the car.[6] After impact, Basye's vehicle continued into the westbound lane and then traveled back across the eastbound lane and off the south side of the road. The event recorder from Basye's vehicle was obtained via a search warrant. The event recorder revealed that five seconds before the impact with Roberts' vehicle, Basye's vehicle was traveling at sixty-three miles per hour. It also showed that Basye's speed had increased to sixty-seven miles per hour at the time of impact.[7]

Kevin Verner, a senior corporal for the DPS, was dispatched to the scene the night of the collision.[8] Verner described the surface of the road where the collision occurred. He also explained that near the location of the accident, there was a curve in the road. He described the curve as having a "slight grade." He continued, "It goes down once you go around the curve." According to Verner, "It's not much of a curve," and in his opinion, the grade of the curve would

---

[5]The written report was admitted into evidence.

[6]Neither Roberts nor T.R. were constrained by a seatbelt.

[7]The speed limit on the highway was sixty-five miles per hour.

[8]Verner stated that he had since retired from the DPS after working there for thirty years.

3

not have had an effect on a driver's visibility. Verner explained that as soon as a driver passes the curve, the road becomes flat "all the way down the highway." Verner stated that following the incident, he remained confused as to why Basye had been driving on the wrong side of the road. According to Verner, about two months later, he learned that Basye had been "playing chicken."[9] That information originated from Basye's son, J.X.

Verner also testified that on the evening of the accident, DPS Trooper Jeff Nichols went to the regional hospital in an effort to speak with the surviving victims.[10] Nichols spoke with Basye's wife, who told him that Roberts had driven into Basye's lane and that Basye was unable to avoid the collision. The day after the crash, Verner attempted to contact Basye by telephone. The male individual who answered the telephone told Verner that Basye was sleeping and that he "had been on and off since the crash." He explained that "he was a relative of Billy Basye's and that Billy had told him that the other vehicle was in his lane and he saw he wasn't going to miss them and reached back to protect the kids." Two days after the collision, Verner went to Basye's residence. Basye's wife appeared at the door and told Verner "that they were advised not to talk to anyone about the crash without an attorney." As a result, Verner was unsuccessful in his attempts to interview Basye.

Cline Young, II, a consulting mechanical engineer specializing in motor vehicle accident reconstruction, testified at the State's request. Young described the collision as being a "head-on accident." In order to reach his conclusions, Young explained, "[T]hat requires an inspection of

---

[9]Verner explained that "playing chicken" meant "two cars coming head-on to each other and the one that jerks first is chicken."

[10]Prior to trial, Nichols died in the line of duty.

both vehicles, an inspection of the accident site in as much detail as you can, and then doing some analysis, and, in this case, using a computer program to demonstrate it." After a very lengthy explanation as to those procedures, Young concluded that Basye's vehicle was traveling in the westbound lane at the moment of impact with Roberts' vehicle. According to Young, there was no evidence showing that Basye ever attempted to avoid the collision. "[T]here was no momentum associated with a steering maneuver to the right as would be expected in a collision-avoidance maneuver." Young continued, "Mr. Basye never applied his brakes." Lastly, Young concluded, "Ms. Roberts was well within her lane,[11] was struck from the left front corner which opened up the driver's side of the Dodge, spun in a counterclockwise manner, struck a power pole, and was ejected as a result of those two collisions, the power pole and the Chevrolet."

On May 6, 2016, J.X. and Z.X. participated in forensic interviews at the Children's Advocacy Center in Fannin County.[12] During J.X.'s interview, he stated that Basye had told him that he should not talk to anyone about the collision. J.X. drew a picture of the accident, explaining, "This is our lane, this is their lane," and then he indicated that the two vehicles collided. When asked why his father had driven over into Roberts' lane, J.X. stated he did not know; however, he did state that Basye asked the children if they wanted to play "chicken." J.X. said he could see that the interior lights were on in Roberts' car, and he identified who he believed to be the passengers in her car. According to J.X., Roberts' headlights were not activated at the time of the collision.

---

[11]Cline also stated that it was his opinion that Roberts' headlights were working properly at the time of the collision.

[12]J.X.'s and Z.X.'s interviews were admitted into evidence.

5

During Z.X.'s interview, he stated that he believed he was being interviewed because of an incident at school involving a knife. When Z.X. was asked if he knew what playing "chicken" meant, he stated that he did not. However, he continued by stating that he thought he had heard someone talking about playing "chicken," but then stated repeatedly that he did not want to talk about it.[13] Eventually, Z.X. explained, "I thought [my dad] said that but I guess he didn't." "I guess I was just hearing things." Z.X. stated that he had attempted to discuss the issue with Basye and that Basye yelled at him, denying that he had ever said anything about playing chicken.[14]

As a result of the collision, Basye was charged with manslaughter.[15] Following a jury trial, Basye was found guilty. The jury assessed his punishment as ten years' confinement in prison. The trial court sentenced him in accord with the jury's assessment. This appeal followed.

## II.    Discussion

### A.    The Trial Court Did Not Err When it Denied Basye's Motion for Mistrial

During its closing argument, the State remarked, "Also, you can consider what Trooper Verner said. During the investigation, he was just trying to figure out what happened. He was

---

[13]Z.X. explained later that he thought Basye had mentioned the word "chicken" the night of the collision.

[14]Constance Marie Rafailedes, a licensed professional counselor and a registered play therapist, testified that she began meeting with J.X. and Z.X. in 2013. Rafailedes explained that she did not ask the children many questions. She continued, "My job [was] to help them deal with the trauma, if they ha[d] suffered trauma, and to emotionally go through whatever [was] going on in their lives and to hopefully heal from it." Initially, J.X. and Z.X. talked about the accident "basically in passing." During that time, neither of the boys mentioned the word "chicken" in relation to the collision. They did, however, indicate that they were being bullied at school as a result of the accident. At the time of trial, Rafailedes was no longer seeing J.X. and Z.X. professionally.

[15]The State's indictment against Basye stated, in part, that on March 6, 2016, in Fannin County,

> **BILLY KEITH BASYE**, did then and there recklessly cause the death of an individual, namely [T.R.], by operating his motor vehicle, a deadly weapon, in an unsafe manner by failing to maintain the proper lane of travel, by failing to maintain a proper lookout for traffic and road conditions, by failing to maintain a single lane of traffic, and/or by changing lanes in an unsafe manner.

6

trying to figure out what happened, getting everybody's sides of the story. *Who's the person that wouldn't talk to him?*" (Emphasis added). Basye contends that the trial court erred when it denied his motion for mistrial following what he contends was an argument calculated to comment on Basye's constitutional right to remain silent.[16] Basye contends that the State's argument directed the jury to conclude from Verner's encounter with Basye's wife that Basye refused to talk to him and, thus, it was a violation of the Fifth Amendment's prohibition against self-incrimination.[17]

The Texas Court of Criminal Appeals has held that "[a] comment on a defendant's post-arrest silence violates the Fifth Amendment prohibition against self-incrimination." *Dinkins v. State*, 894 S.W.2d 330, 356 (Tex. Crim. App. 1995) (citing *Doyle v. Ohio*, 426 U.S. 610, 617–18 (1976); *Miranda v. Arizona*, 384 U.S. 436, 468 n.37 (1966)). The court explained that "[a] comment on a defendant's post-arrest silence is akin to a comment on his failure to testify at trial because it attempts to raise an inference of guilt arising from the invocation of a constitutional right." *Id.*

---

[16]"A mistrial is an appropriate remedy in 'extreme circumstances' for a narrow class of highly prejudicial and incurable errors." *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009) (quoting *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004)). "A mistrial halts trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile." *Id.* (citing *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)). Whether an error requires a mistrial must be determined by the particular facts of the case." *Id.* We review a trial court's denial of a mistrial under an abuse-of-discretion standard. *Sanders v. State*, 387 S.W.3d 680, 687 (Tex. App.—Texarkana 2012, pet. ref'd). We consider "the evidence in the light most favorable to the trial court's ruling, considering only those arguments before the court at the time of the ruling." *Ocon*, 284 S.W.3d at 884 (citing *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004)).

[17]Basye also objected to the State's argument, maintaining that it was outside of the record. The trial court sustained his objection and asked the State to limit its argument in scope and time. The trial court continued, "Otherwise, the objection is sustained." The State continued to argue that Verner attempted to contact Basye and that he was unsuccessful in doing so. That evidence was clearly in the record.

By contrast, pre-arrest and pre-*Miranda* silence can be used for impeachment under both the United States and Texas Constitutions. *See Salinas v. State*, 369 S.W.3d 176, 179 (Tex. Crim. App. 2012) ("We hold that pre-arrest, pre-*Miranda* silence is not protected by the Fifth Amendment right against compelled self-incrimination, and that prosecutors may comment on such silence regardless of whether a defendant testifies."); *see also Cisneros v. State*, 692 S.W.2d 78, 85 (Tex. Crim. App. 1985) (holding that "prosecutor's questions to the appellant as to his prearrest silence" did not violate the United States Constitution and stating, "[W]e [did] not conclude that Article I, §§ 10 and 19, Texas Constitution, call for a different result in Texas as to prearrest silence . . . ."). Consequently, because Basye was neither subjected to questioning nor under arrest at the time of Verner's attempt to speak with him, the State's mention of Basye's alleged avoidance of Verner was not a comment on his constitutional right to remain silent. Therefore, the trial court did not err in denying Basye's motion for mistrial.

### B. The Trial Court Did Not Err When it Overruled Basye's Objection to the State's Closing Argument

Next, Basye contends that the trial court erred when it overruled his objection to a portion of the State's closing argument, which he maintains contained facts outside of the record. Again, Basye complains of the portion of the State's argument wherein it stated, "[Verner] was trying to figure out what happened, getting everybody's sides of the story. *Who's the person that wouldn't talk to him*?" (Emphasis added). According to Basye, "The prosecutor's improper assertion that Basye *refused* to speak with the Trooper was meant to establish Basye had a consciousness, or, as he put it, an 'awareness' of his guilt."

The purpose of a closing argument is to facilitate the juror's analysis of the evidence presented at trial in order to arrive at a just and reasonable conclusion based on the evidence alone, and not on any fact not admitted into evidence. *See Campbell v. State*, 610 S.W.2d 754, 756 (Tex. Crim. App. [Panel Op.] 1980). "Permissible jury argument falls into one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) an answer to the argument of opposing counsel; or (4) a plea for law enforcement." *Cannady v. State*, 11 S.W.3d 205, 213 (Tex. Crim. App. 2000). Even when an argument exceeds the permissible bounds of these approved areas, it will not be reversible unless the argument is extreme or manifestly improper, violates a mandatory statute, or injects into the trial new facts harmful to the accused. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000) (citing *Todd v. State*, 598 S.W.2d 286, 296–97 (Tex. Crim. App. [Panel Op.] 1980)).

The prosecutor's remarks must have been a willful and calculated effort to deprive a defendant of a fair and impartial trial. *Id.* (citing *Cantu v. State*, 939 S.W.2d 627, 633 (Tex. Crim. App. 1997)). An attorney is "afforded wide latitude . . . as long as [it] is supported by the evidence and in good faith." *Stewart v. State*, 995 S.W.2d 187, 190 (Tex. App.—Fort Worth 1999, pet. ref'd). In most instances, the court's instruction to disregard the remarks will cure the error. *Wilkerson v. State*, 881 S.W.2d 321, 327 (Tex. Crim. App. 1994).

Even assuming, without finding, that the complained-of argument was impermissible, Basye's contention remains without merit. In general, improper jury argument is considered to be a nonconstitutional error. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998). Nonconstitutional error that does not affect the substantial rights of an accused must be

9

disregarded. TEX. R. APP. P. 44.2(b). When determining whether improper jury argument affects an accused's substantial rights, courts examine the following three factors: (1) "the severity of the misconduct"; (2) the "measures adopted to cure the misconduct"; and (3) "the certainty of conviction absent the misconduct." *Mosley*, 983 S.W.2d at 259. If the record as a whole reflects a "fair assurance that the error did not influence the jury, or had but a slight effect," the conviction must not be reversed. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

In this case, the State did not emphasize during its argument that Basye "refused" to speak to Verner. Moreover, the jury heard evidence that Basye did not participate in an interview with Verner and did not answer or return Verner's telephone calls.[18] In addition, the jury heard J.Z.'s statement during his Children's Advocacy Center interview that Basye told him that he was not to speak to anyone about the wreck. From that evidence alone, the jury could have reasonably presumed that Basye had no interest in or intention of discussing the incident with law enforcement officers. Further, it was within the jury's purview to make reasonable deductions from the evidence that had been properly admitted.

Assuming that the State's actions could be considered "misconduct," the trial court instructed the jury to disregard the State's comment that Basye "wouldn't talk." In addition, the trial court instructed the jury, "Statements made by attorneys during the trial are not evidence." Further, the trial court charged the jury,

> [T]he law allows the defendant to testify in his own behalf, but an election on his part not to do so is not a circumstance against him, and no presumption of guilt can be indulged in by the jury for an election on his part not to do so. I instruct you in

---

[18]The jurors were also allowed to review Verner's written report, which contained Verner's comments that he was unable to speak to Basye in person or on the telephone.

10

> this case not to consider, discuss, or even refer to such an election on the part of the defendant not to testify during the consideration of this case.

"We generally presume the jury follows the trial court's instructions in the manner presented." *Graham v. State*, 96 S.W.3d 658, 661 (Tex. App.—Texarkana 2003, pet. ref'd) (citing *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998)).

More importantly, however, the overwhelming evidence against Basye was scientific or technical in nature. Young testified that as a result of his extensive investigation, he concluded that Roberts' vehicle had been traveling in its own lane at the moment of impact. He also stated that there was no evidence demonstrating that Basye attempted to apply his brakes in an effort to avoid the collision. In addition, the contents of the event recorder from Basye's vehicle corroborated Young's testimony. It also showed that five seconds before the impact, Basye's vehicle was traveling at sixty-three miles per hour, but that it had increased to sixty-seven miles per hour at the time of impact. The technical evidence also corroborated J.Z.'s statement during his interview that Basye had been playing a game of "chicken." All of that evidence, and the amount of time the State spent reminding the jury of it, substantially minimized the weight and importance of the complained-of statement. We are, therefore, fairly assured that the error did not influence the jury, or had but a slight effect on its verdict. *See Mosley*, 983 S.W.2d at 260.

We overrule Basye's second point of error.

## III.  Conclusion

We affirm the trial court's judgment.


Bailey C. Moseley
Justice


Date Submitted:     December 21, 2018
Date Decided:       January 14, 2019

Do Not Publish